IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MATTHEW BROWNE,<br>KRISTOPHER PFEIFER, and<br>PRESTON LAHMER,<br><br>Defendants. | CR 16–27–M–DLC<br><br>ORDER |

Defendant Matthew Browne ("Browne") moves the Court to suppress the evidence seized from the search of his vehicle on June 8, 2016, and his related statements to law enforcement. For the reasons explained below, the Court denies Browne's motion.

**FACTUAL AND PROCEDURAL BACKGROUND**

On approximately June 5, 2016, Troy Capser ("Agent Capser"), a special agent with the Department of Homeland Security Investigations Division ("HSI"), received a tip from Constable Jeff Meyers ("Constable Meyers") of the Royal Canadian Mounted Police, that a large amount of cocaine was going to be smuggled through Montana into Canada. Constable Meyers told Agent Capser

that a blue Chevy Avalanche with British Columbia or California license plates would be driving through or near Kalispell, Montana, sometime in the next few days. This truck would be driven by a man named Matt and have a false bed loaded with cocaine. The drugs, according to Constable Meyers, were to be backpacked into Canada through a remote area near Libby, Montana, known as the Yaak. Constable Meyers, however, did not tell Agent Capser the source of the information.

Agent Capser quickly sent out a text message to other law enforcement officers in the region relaying some, but not all of Constable Meyer's information.[1] Agent Capser told the officers to be on the lookout over the next few days for a blue Chevy Avalanche with British Columbia license plates. This vehicle, Agent Capser told the officers, was headed towards the Yaak where the drugs would be taken into Canada. This information was relayed to additional officers, including Detective Nate Scofield ("Detective Scofield") of the Lincoln County Sheriffs' Office.

Detective Scofield received the tip on June 6, 2016. Two days later, on June 8, he located a vehicle matching that description near Libby, Montana, and

---

[1] At the suppression hearing, it was not clear if Agent Capser initially told Detective Nate Scofield, the law enforcement officer who initiated the stop of Browne's truck, that the driver of the vehicle would be named Matt.

began to follow it.  The vehicle was leaving town and heading east towards Kalispell, Montana.  After driving for a few miles, the truck turned around and started driving west, back towards Libby.  During this time, Detective Scofield contacted Agent Capser by cell phone and explained that he was following a vehicle matching the description supplied in the tip.  Agent Capser told him to find a lawful reason to pull the truck over.

Seeing an opportunity, Detective Scofield quickly called Sergeant Brandon Holzer ("Sergeant Holzer"), a sheriff's deputy with the Lincoln County Sheriffs' Office, and explained he was following a blue Chevy Avalanche suspected of carrying drugs.  Detective Scofield told Sergeant Holzer to park at the bottom of a hill heading into Libby and see if he could catch the truck speeding.  This area, known as Whiskey Hill, was well known for speeding due to its incline and successive reduced speed limits.  Sergeant Holzer was told to set up his radar gun and wait for the truck.  As predicted, Sergeant Holzer clocked the truck going six miles over the posted speed limit and stopped the vehicle.

Sergeant Holzer approached the truck and spoke with the driver and sole occupant, Defendant Matthew Browne ("Browne").  Sergeant Holzer told Browne that he had stopped him for speeding and asked for his license, registration, and proof of insurance.  Browne complied and Sergeant Holzer asked what he was

doing in Montana. Browne replied that he was on a road trip. After confirming that Browne owned the vehicle, Sergeant Holzer asked how much longer he would be in the United States. Browne said another week. Sergeant Holzer told him to "hold tight" and headed back to his patrol car with Browne's driver's license, vehicle registration, and proof of insurance. This initial interaction took roughly 90 seconds.

At this time, Detective Scofield had just arrived on scene and Sergeant Holzer quickly relayed to him that Browne was shaking.[2] Sergeant Holzer also later testified at the suppression hearing that Browne was visibly shaking, in particular his hands, and his throat was pounding on the side of his neck.[3] Detective Scofield took Browne's license from Sergeant Holzer and made a cell phone call to Agent Capser. Sergeant Holzer returned to his patrol car and radioed for a registration check. Agent Capser, who had been driving to Libby from Kalispell, told Detective Scofield that the driver's name would be Matt, and after confirming with Scofield that the driver's name was Matt, Agent Capser told

---

[2] Based on a review of Sergeant Holzer's body camera video from the stop, the Court believes that he meant to say "shaking," but it sounds as if he said the word in a slang manner, i.e., "shaken" or "shakin."

[3] Browne's hands and most of his body are not visible on the body camera video. However, the Court did not see anything on the video that would contradict Sergeant Holzer's physical description of Browne.

doing in Montana. Browne replied that he was on a road trip. After confirming that Browne owned the vehicle, Sergeant Holzer asked how much longer he would be in the United States. Browne said another week. Sergeant Holzer told him to "hold tight" and headed back to his patrol car with Browne's driver's license, vehicle registration, and proof of insurance. This initial interaction took roughly 90 seconds.

At this time, Detective Scofield had just arrived on scene and Sergeant Holzer quickly relayed to him that Browne was shaking.[2] Sergeant Holzer also later testified at the suppression hearing that Browne was visibly shaking, in particular his hands, and his throat was pounding on the side of his neck.[3] Detective Scofield took Browne's license from Sergeant Holzer and made a cell phone call to Agent Capser. Sergeant Holzer returned to his patrol car and radioed for a registration check. Agent Capser, who had been driving to Libby from Kalispell, told Detective Scofield that the driver's name would be Matt, and after confirming with Scofield that the driver's name was Matt, Agent Capser told

---

[2] Based on a review of Sergeant Holzer's body camera video from the stop, the Court believes that he meant to say "shaking," but it sounds as if he said the word in a slang manner, i.e., "shaken" or "shakin."

[3] Browne's hands and most of his body are not visible on the body camera video. However, the Court did not see anything on the video that would contradict Sergeant Holzer's physical description of Browne.

Scofield that they had stopped the suspected smuggler. Detective Scofield finished his phone call with Agent Capser and approached the truck to talk with the Browne.

At the truck, Detective Scofield introduced himself to Browne and confirmed that Browne's name was Matt. Detective Scofield asked if he had a minute to talk and Browne said yes. Detective Scofield began questioning Browne about his travel plans and learned that he was allegedly driving to Washington through Idaho and then returning to Canada. Detective Scofield further learned that Browne had been in the United States for the last couple of weeks, but could not remember the day he entered the country. Nonetheless, Browne told Detective Scofield that he had entered the country through Washington and then drove through Oregon to California.

At this point, Detective Scofield noticed that Browne was wearing "hunting pants"[4] and asked if he had any weapons in the vehicle. Browne said no and they began to discuss hunting. Browne said he was "a big hunter" in Canada and Detective Scofield asked where he hunted. Browne replied that he hunted near Hundred Mile, Seventy Five Mile, and Fifty Mile. After confirming that those

---

[4] At the suppression hearing, Detective Scofield confirmed that Browne was wearing camouflage pants when he was stopped.

were town names, Detective Scofield asked Browne if he visited anyone while he was California. Browne said no. After further questioning, Detective Scofield was told that Browne had taken about two or three days to drive to California, where he stayed for around a week. Detective Scofield asked Browne what he did while he was in California and he replied that he attended a Dodgers game and went to San Diego. Detective Scofield then confirmed for a second time that Browne had not visited anyone. Like Sergeant Holzer, Detective Scofield confirmed that the vehicle was registered to Browne in British Columbia. Following this confirmation, Detective Scofield told Browne his story seemed "weird" and asked a series of questions about whether Browne was in possession of narcotics, including cocaine. Browne replied to each question in the negative. With that, Detective Scofield told Browne to "hang tight for a minute" and to "shut the truck off."

At this point, Detective Scofield began calling various law enforcement officers for a K-9 unit. Within minutes, United States Border Patrol Agent and Canine Handler David Grainger ("Agent Grainger") called back and said he would head over to Libby. Agent Grainger's duty station is in Bonners Ferry, Idaho, roughly 45 to 60 minutes away from Libby. Agent Grainger testified that there are no K-9 units in Libby and he was most likely the nearest unit. He arrived roughly

45 to 60 minutes later and ran his canine around the vehicle. The canine immediately "alerted" to the rear of the vehicle. Detective Scofield asked Browne for his consent to search the truck and verbal consent was given. A search of the vehicle revealed a false bottom under the bed of the truck where roughly 145 pounds of cocaine were found. Browne was taken into custody and Mirandized. He subsequently made incriminating statements.

## DISCUSSION

Browne contends that his Fourth Amendment rights were violated when he was stopped and allegedly unlawfully detained. Specifically, Browne contends that: (1) law enforcement lacked reasonable suspicion to stop his vehicle; (2) law enforcement unduly prolonged the traffic stop; (3) law enforcement unlawfully seized him; (4) law enforcement lacked reasonable suspicion to detain him; (5) his due process right's right were violated because law enforcement did not inform him of the true basis for the stop; and (6) all evidence that resulted from the stop must be suppressed.

### A. Reasonable Suspicion for the Traffic Stop

As discussed, Browne challenges the traffic stop as unreasonable. This threshold inquiry is dispositive to Browne's motion. If law enforcement violated Browne's Fourth Amendment right to be free from "unreasonable searches and

seizures" when he was stopped, "then all evidence seized as a result of the stop must be suppressed as the fruit of the poisonous tree." U.S. Const. amend. IV; *United States v. Morales*, 252 F.3d 1070, 1073 (9th Cir. 2001) (citing *Wong Sun v. United States*, 371 U.S. 471, 484–485 (1963)).  In order to stop, i.e., seize an individual, "law enforcement officers must have at least a reasonable suspicion of criminal activity before stopping a suspect." *Morales*, 252 F.3d at 1073 (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)); *see also Delaware v. Prouse*, 440 U.S. 648, 653(1979) (extending *Terry* to car stops).  Reasonable suspicion is "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Thomas*, 211 F.3d 1186, 1189 (9th Cir. 2000) (internal quotation marks and citation omitted). "Reasonable suspicion requires specific, articulable facts which, together with 'objective and reasonable' inferences, form a basis for suspecting that a particular person is engaged in criminal conduct." *Id.* (citation omitted).

Here, the Government contends that there was reasonable suspicion to stop Browne for two independent reasons: (1) he was violating the posted speed limit; and (2) the information provided by the Constable Meyers established reasonable suspicion to initiate a stop.  As discussed below, because the Court agrees with the Government's first argument and finds that Browne committed a traffic violation,

it need not take up the second argument.

Sergeant Holzer testified that Browne exceeded the posted speed limit by six miles by driving 56 miles per hour in a 50 miles per hour zone. Sergeant Holzer stated that he used speed detection equipment, in particular a MPH Python III radar gun, to make this determination. The Court finds Sergeant Holzer's testimony credible. Accordingly, the Court determines that Sergeant Holzer's testimony provided a particularized and objective basis for determining that Browne had violated the law. Thus, reasonable suspicion existed to stop Browne's truck.

Notwithstanding this finding, Browne argued in his brief in support of the motion to suppress that, *arguendo*, if he was speeding,[5] he was doing so in order to pass and overtake a semi-trailer truck. In Montana, a "vehicle . . . traveling on a two-lane road may exceed the [posted] speed limit[] . . . by 10 miles an hour in

---

[5] Browne also points to the fact that Browne never received a speeding ticket as a result from the stop and argues that this cuts against the Goverment's argument that he was speeding. The Court disagrees. First, Sergeant Holzer testified that he generally does not issue speeding tickets for driving six miles over the posted speed limit. Second, Sergeant Holzer further testified that the motivating factor behind the stop was the suspicion that Browne was trafficking narcotics. Because pretextual traffic stops are permissible as long as they are supported by a genuine traffic violation, the Court is not surprised that Browne was not issued a speeding ticket. *See United States v. Choudhry*, 461 F.3d 1097, 1102 (9th Cir. 2006) ("[A] traffic violation was sufficient to justify an investigatory stop, regardless of whether (i) the violation was merely pretextual, (ii) the stop departed from the regular practice of a particular precinct, or (iii) the violation was common and insignificant.").

order to overtake and pass a vehicle and return safely to the right-hand lane." Mont. Code. Ann. § 61–8–303(2). Thus, Browne contends that even if he was speeding, it was lawful.

However, despite this contention, no evidence was presented at the hearing to support Browne's argument. In fact, Sergeant Holzer directly contradicted this argument by testifying that Browne's vehicle was a considerable distance behind the semi-trailer truck and in no way appeared as if it was going to pass.[6] The Court thus finds that the evidence offered at the hearing does not support Browne's argument that he was passing the semi-trailer truck.

## B. Reasonable Suspicion to Detain Browne and Prolong the Stop

Next, Browne contends that law enforcement lacked reasonable suspicion to detain him longer than necessary to resolve the traffic violation. The Court disagrees.

Browne is correct that "a seizure that is lawful at its inception can violate

---

[6] The Court also notes that Montana law requires a driver to "operate a vehicle in a careful and prudent manner and at a reduced rate of speed no greater than is reasonable and prudent under the conditions existing at the point of operation, taking into account the amount and character of traffic, visibility, weather, and roadway conditions." Mont. Code. Ann. § 61–8–303(3). Here, it is undisputed that it was heavily raining at the time of the traffic stop. Further, Browne argued in his brief that standing water existed on the highway at the time he was allegedly attempting to pass. The evidence thus suggests that weather and roadway conditions at this time were not conducive to operating a vehicle in excess of the posted speed limit. The Court thus finds that even if Browne was attempting to pass, this was neither reasonable nor prudent under the conditions.

the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). Importantly, "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Id.* However, "an officer may prolong a traffic stop if the prolongation itself is supported by independent reasonable suspicion." *United States v. Evans*, 786 F.3d 779, 788 (9th Cir. 2015).

First, as a preliminary matter, the Court finds that the investigation of the traffic stop ceased, at the earliest, the moment Sergeant Holzer stepped out of his patrol car to assist Detective Scofield in his questioning of Browne. The Court bases this finding on Sergeant Holzer's testimony that after he called in Browne's registration and received no "hits" back, he stopped investigating the traffic violation because it was obvious to him that Detective Scofield's investigation into suspected narcotics trafficking had taken over. Thus, the Court must determine if further detainment of Browne by Detective Scofield was justified by independent reasonable suspicion.

The Government argues that the anonymous tip[7] provided by Constable

---

[7] At the hearing, Agent Capser testified that he was not aware of Constable Meyer's source for the information supporting the tip. The Court will thus treat this information as an anonymous tip. *See Morales*, 252 F.3d at 1074 (Ninth Circuit found that tip passed from one law

-11-

Meyers justified further detainment of Browne because it was corroborated by Detective Scofield. The Goverment contends that this corroboration established independent reasonable suspicion. The Court agrees.

"In certain circumstances, an anonymous tip can serve as the basis for reasonable suspicion." *Morales*, 252 F.3d at 1074 (citing *Alabama v. White*, 496 U.S. 325, 327–328 (1990). However, "an anonymous tip standing alone does not" support a finding of reasonable suspicion. *Morales*, 252 F.3d at 1074–75 (citing *Florida v. J.L.*, 529 U.S. 266, 270 (2000)). Instead, "something more" than just the information is needed. *White*, 496 U.S. at 329. To determine if an anonymous tip supports a suspicion that criminal activity is taking place, courts look to the totality of the circumstances to establish if the information was supported by an "indicia of reliability." *Id.* at 331. This is due to the fact that an anonymous tip is inherently unreliable because the source of the information "cannot be held accountable if he or she provides inaccurate information, and the police cannot assess the tipster's reputation." *J.L.*, 529 U.S. at 270.

Thus, to determine if an anonymous tip has a sufficient "indicia of reliability to serve as the basis for [reasonable suspicion], the tip must include a range of

---

enforcement agency to another was considered anonymous because information about the source of the tip was not provided).

details, and it must predict future actions by the suspect that are subsequently corroborated by the police." *Morales*, 252 F.3d at 1074–75 (citing *White*, 496 U.S. at 329) (quotation marks omitted); *see also Illinois v. Gates*, 462 U.S. 213, 245 (1983) (Court found anonymous letter reliable because it "contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted"). Additionally, corroboration of the facts supplied in the tip enhance the reliability and veracity of the information and thus strengthen the possibility that criminal activity is taking place. *See Gates*, 462 U.S. at 244 ("Because an informant is right about some things, he is more probably right about other facts.") (citation omitted).

Here, by the time Detective Scofield first spoke with Browne, he had independently corroborated specific factual details supplied in the anonymous tip, including: the name of the driver (Matt), the make, model, and color of the vehicle (blue Chevy Avalanche), and the vehicle's place of registration and country of origin (British Columbia, Canada). Further, the tip accurately predicted the vehicle's general location (near or heading to the Yaak) and general time frame for when the vehicle was suppose to be heading to this location (a couple of days after

June 5, 2016).[8]  Finally, Detective Scofield also knew from his brief conversation with Sergeant Holzer that Browne was shaking.[9]  The Court finds that these specific and objective facts support a finding of particularized suspicion that Browne may have been involved with criminal activity, specifically narcotics trafficking.  Specifically, the Court finds that it was reasonable for Detective Scofield to briefly prolong the traffic stop for further investigation based on the corroborated facts from the anonymous tip and Sergeant Holzer's description of Browne's demeanor.

### C. Prolonged Stop for Canine Search

Browne next argues that law enforcement unlawfully prolonged the traffic stop in order to allow for the canine unit to arrive.  The Court again disagrees.

"In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police

---

[8] The Court recognizes that under *White*, an investigatory stop based solely on Constable Meyer's tip may not have been reasonable.  In *White*, prediction and subsequent corroboration of a suspect's specific future movements by an anonymous tip were required to conduct an investigatory stop based on reasonable suspicion.  *See White*, 496 U.S. at 332.  Here, the tip only predicted Browne's future travels in general terms.  However, in contrast to *White*, the initial stop was based on a valid traffic violation.  Following this valid traffic stop, Detective Scofield established independent reasonable suspicion that illegal activity was taking place which justified prolonging the stop.  This case is thus distinguishable from *White*.

[9] Detective Scofield testified that he understood Sergeant Holzer's comments to mean that Browne was acting nervous.

diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). "[A] dog sniff . . . is not an ordinary incident of a traffic stop." *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015). Thus, use of a canine unit to conduct a sniff search which prolongs a stop is only permissible if it is independently supported by an officer's individualized suspicion. *Id.* at 1616–1617.

Here, after speaking with Browne, which took roughly four minutes,[10] Detective Scofield told Browne to "hold tight" and immediately called Agent Grainger for use of his canine unit. Agent Grainger arrived between 45 to 60 minutes later and quickly conducted a sniff search. Consequently, Browne was detained an additional 45 to 60 minutes beyond the point the initial traffic stop investigation had ceased. As discussed below, the Court finds that this prolongation was reasonable because it was supported by independent and particularized suspicion.

The Court bases this finding on multiple reasons. First, as discussed, Detective Scofield had already independently corroborated multiple specific

---

[10] As discussed above, the Court finds that it was reasonable for Detective Scofield to detain and question Browne for these additional four minutes.

factual details alleged in the anonymous tip. Thus, at this point it was extremely likely that Browne was the suspect described in the tip. Second, Sergeant Holzer told Detective Scofield that Browne was acting nervous. Third, Detective Scofield testified that Browne's description of his travels were "very vague." Specifically, Browne told Detective Scofield that he could not remember the day he entered the United States. Browne also stated that he had been traveling for multiple weeks through Washington, Oregon, and California, before driving up to Montana, but did not provide any details about his trip, apart from attending a Dodgers game and going to San Diego. Detective Scofield further found it odd that Browne could not name any people he had met or visited. This lack of detail was not normal to Detective Scofield and, based upon his training as a law enforcement officer, he concluded that Browne was holding back information about his travels. At this point, Detective Scofield testified that he suspected Browne of trafficking narcotics.[11]

      Under these circumstances, the Court concludes that Detective Scofield's

---

[11] Detective Scofield also testified that Browne was wearing camouflage pants the day he was stopped and asked him questions about his hunting activities. Detective Scofield testified that he found Browne's description of his past hunting activities odd. The Court neither agrees nor disagrees with Detective Scofield's determination that Browne's description of his hunting activities was odd. However, the Court notes that it would be a logical inference to connect camouflage clothing with drug smuggling, apparently since the drugs in question were going to be transported by foot across the Canadian border in heavily wooded terrain.

suspicions were particularized and based on specific and articulable facts. Detective Scofield's conclusion that Browne was likely involved with drug smuggling was reasonable. Accordingly, further detainment of Browne to allow for a sniff search would have quickly confirmed or dispelled Detective Scofield's suspicions. Prolongation of the stop thus did not violate Browne's Fourth Amendment rights.[12]

Further, the Court finds that the length of time needed to allow for the canine unit to arrive on scene was reasonable. The stop occurred in a rural area of Montana by a town that did not have a resident canine unit. Further, Agent Grainger testified that he was the nearest canine unit and he arrived as quickly as he could. Thus, under these facts it was reasonable to prolong the stop for an additional 45 to 60 minutes to allow for the sniff search. *See United States v. $102,836.00 in U.S. Currency*, 9 F. Supp. 3d 1152, 1161 (D. Nev. 2014) (Detainment of suspect for twenty to thirty minutes beyond the initial traffic stop to wait for nearest canine unit was reasonable).

Lastly, Browne argues that *United States v. Morales* is controlling to this case. *Morales*, similar to this case, involved an anonymous tip concerning a

---

[12] The Court bases this finding in large part on the testimony of Detective Scofield. The Court found Detective Scofield to be a credible witness and placed great weight on his testimony.

specific vehicle traveling to an identified location. *Morales*, 252 F.3d at 1071–1072. The officers in *Morales* stopped the vehicle under a good faith but mistaken belief that it was operating in violation of the law. *Id.* at 1072. In spite of this erroneous belief, the Government argued that the stop was still lawful based solely on details provided in the tip that were subsequently corroborated by the officers, including: (1) the make, model, and year of the vehicle; (2) an alternative licence plate number for the vehicle; (3) the number of occupants in the vehicle; and (4) the vehicle's general direction of travel. However, the Ninth Circuit affirmed the district court's suppression order after concluding the tip "did not possess sufficient indicia of reliability to justify an investigative stop of the defendants' car." *Id.* at 1077 (citing *J.L.*, 529 U.S. at 271) (quotation marks omitted).

    Here, unlike *Morales*, Sergeant Holzer had reasonable suspicion to stop Browne because he committed a genuine traffic violation. As discussed, following this initial lawful stop, Detective Scofield developed independent and particularized suspicion that Browne was trafficking narcotics. In addition to the information provided in the tip that was subsequently corroborated by Detective Scofield, he was also told by Sergeant Holzer that Browne was acting nervous. These facts support Detective Scofield's initial questioning which prolonged the

stop by a mere four minutes. Further, after speaking with Browne, Detective Scofield's suspicions were additionally heightened because he found Browne's story to be vague and lacking in detail. Due to this lack of detail, Detective Scofield determined that Browne was hiding something, most likely criminal activity. This case is thus distinguishable from *Morales*. Consequently, the Court rejects Browne's argument that law enforcement lacked reasonable suspicion to detain him and prolong the traffic stop.

### D. Browne's Due Process Rights

Browne also argues that his due process rights under the Fifth Amendment were violated because he was never told the true basis for stop. However, the United States Supreme Court has never recognized the right to be told the reason for one's detainment. *See Devenpeck v. Alford*, 543 U.S. 146, 155 (2004) ("While it is assuredly good police practice to inform a person of the reason for his arrest at the time he is taken into custody, we have never held that to be constitutionally required."); *but see United States v. Magallon-Lopez*, 817 F.3d 671, 677 (9th Cir. 2016) (Berzon, J., concurring) ("I would not foreclose, in another case, holding that there is a due process (not Fourth Amendment) based right to be informed of the true basis for a stop or arrest."). The Court declines to hold otherwise.

In conclusion, because the Court has found that Browne's stop and

subsequent prolonged detainment were lawful under the Fourth Amendment, the Court will deny his motion to suppress. Accordingly,

IT IS ORDERED that Defendant Matthew Browne's Motion to Suppress (Doc. 71) is DENIED.

DATED this 8th day of November, 2016.

/s/ Dana L. Christensen
Dana L. Christensen, Chief District Judge
United States District Court